**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Allison Sharits, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Dustin Dernier; Velocity Ventures Group, LLC d/b/a Infinity Enterprise Lending Systems, Inc.; Forest Hill Account Management, Inc.; Steve Christensen; Anthony Reider; Cydni Weddell; April Herrick; Ryan Kills A Hundred; Kristi Beitz; David Ross; Johnathan Schrader, Sr.; and John Does 1–40,<br><br>Defendants. | Case No. 25-cv-11944<br><br>Judge Mary M. Rowland |

**MEMORANDUM OPINION AND ORDER**

Defendants Dustin Dernier ("Dernier") and Steven Christensen, Anthony Reider, Cydni Weddell, April Herrick, Ryan Kills A Hundred, Kristi Bietz, David Ross, and Johnathan Schrader Sr. (collectively the "Tribal Defendants," and with Dernier, the "Moving Defendants") move to compel arbitration and stay, or, in the alternative, to dismiss proceedings in this putative class action brought by Plaintiff Allison Sharits for violations of RICO as well as various federal and state laws. For the reasons stated herein, Defendants' Motion to Compel Arbitration and stay, or, in the Alternative, Dismiss [34] is denied.

## I. Background

Plaintiff Allison Sharits is a citizen and resident of Illinois. [1] ¶ 15. Plaintiff entered into an agreement with the Flandreau Santee Sioux Tribe (the "Tribe") and/or entities under the control of the Tribe to take out a loan for $600. *See* [1] ¶¶ 5-6.

The Tribe is governed by an elected Executive Committee[1] that manages the Tribe's economic affairs. [1] ¶ 45. The Committee consists of the Tribal Defendants: Defendants Anthoney Reider, Cydni Weddell, April Herrick, Ryan Kills A Hundred, Kristi Bietz, David Ross, and Jonathan Shrader (collectively, the "Tribal Defendants"). [1] ¶ 47.

Defendant Dernier is a citizen, a resident of Missouri, and not a member of the Tribe. [1] ¶ 16. Plaintiff alleges that Defendant has been involved in a spate of predatory lending schemes dating back to at least 2013. [1] ¶¶ 33-42.[2] At some point after 2016, Dernier convinced Tribal Defendants to become involved in a tribal lending scheme. [1] ¶ 44. Tribal Defendants agreed and created an entity called FFST Management Services, LLC ("FMS") to offer lending services. [1] ¶ 48.

FMS owns and operates another entity called 605 Lending, which Dernier runs. [1] ¶ 16. Dernier holds himself out as the CEO of FMS. [1] ¶ 16. Various of the Tribal Defendants hold executive titles in FMS, but Plaintiff alleges these titles exist only as a front to make it appear that FMS is run by members of the Tribe. [1] ¶¶ 48-53.

---

[1] The parties at times refer to an "Executive Council" and "Executive Committee" interchangeably. The Court understands these terms to be synonymous and uses "Executive Committee" throughout this memorandum.

[2] For example, Dernier allegedly has experience running a Kansas-based company that offered online payday loans with annual interest rates of 600% or higher. [1] ¶ 34.

Non-tribal entities, including several non-Moving Defendants, fund FMS's lending operations. [1] ¶ 55. [1] ¶ 55-63. The majority of the money made by FMS flows to Dernier and other non-tribal actors; the Tribe receives only a portion of the revenues. [1] ¶¶ 72.

While in her residence in Berwyn, Illinois, Plaintiff applied for and took out a loan (the "Loan") for $600 from 605 Lending in March 2024. [1] ¶ 73. 605 Lending charged her an interest rate of 777.36%, and the loan included a financing charge of $2,377.38. [1] ¶ 74. Plaintiff paid a total of $741.31 on her loan, and in January 2025 the loan was sent to collections. [1] ¶¶ 75-82. At that point, various non-Moving Defendants charged her additional exorbitant fees in order to settle her debt. *Id*. Plaintiff's contract with 605 Lending contains an arbitration agreement, which is the subject of Defendants' motion to compel arbitration. [35-2] Ex. A (the "Agreement").

Plaintiff's complaint contains 11 causes of action; the Court lists below only those relevant to Moving Defendants' motion.

| **Count** | **Claim** | **Defendants** |
|---|---|---|
| I | Violation of RICO, 18 U.S.C. § 1962(c) | Dernier and other Non-Moving Defendants |
| II | Conspiracy to violate RICO, 18 U.S.C. § 1962(d) | Dernier and other Non-Moving Defendants |
| III | Violation of the Illinois Predatory Loan Prevention Action, 815 ILCS 123/15-1-10 | Dernier and other Non-Moving Defendants |
| IV | Violation of the Illinois Payday Loan Reform Act and Illinois Consumer Fraud and Deceptive Business Practices | Dernier and other Non-Moving Defendants |
| VII | Unjust enrichment | Dernier and other Non-Moving Defendants |
| VIII | Civil conspiracy | Dernier and other Non-Moving Defendants |

| | | |
|---|---|---|
| IX | Violations of state law | Tribal Defendants, in their official capacities for prospective relief |
| X | Violations of RICO, 18 U.S.C. § 1962(c), (d) | Tribal Defendants, in their official capacities for prospective relief |
| XI | Declaratory judgment | Tribal Defendants, in their official capacities for prospective relief |

Moving Defendants move to compel all claims against them to arbitration, or in the alternative to (1) dismiss the claims under the doctrine of sovereign immunity or (2) dismiss the RICO claims for failure to state a claim.

## II. Legal Standards

### A. Motion to Compel Arbitration

Under the Federal Arbitration Act ("FAA"), "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). It reflects a "liberal federal policy favoring arbitration agreements," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)), and places "arbitration agreements on an equal footing with other contracts," *Gore v. Alltel Comm'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (quoting *Concepcion*, 563 U.S. at 339). "When deciding whether the parties agreed to arbitrate a certain matter, courts generally should apply ordinary state-law principles that govern the formation of contracts." *Druco Rest., Inc. v. Steak N Shake Enterp., Inc.*, 765 F.3d 776, 781 (7th

Cir. 2014). "Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must give effect to the contractual rights and expectations of the parties." *Smith v. Bd. of Directors of Triad Mfg., Inc.*, 13 F.4th 613, 619 (7th Cir. 2021) (cleaned up).

Under the FAA, in response to a party's refusal to arbitrate despite a written agreement for arbitration, the opposing party "may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. The party seeking to compel arbitration bears the burden to show an agreement to arbitrate. *Id.*; *see A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018). "The court may consider exhibits and affidavits regarding the arbitration agreement in question." *Friends for Health: Supporting N. Shore Health Ctr. v. PayPal, Inc.*, No. 17 CV 1542, 2018 WL 2933608, at *3 (N.D. Ill. June 12, 2018). Once the moving party makes its initial showing, the party resisting arbitration bears the burden of identifying a triable issue of fact on the purported arbitration agreement. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). The resisting party's evidentiary burden is like that of a party opposing summary judgment. *Id*. "[A] party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Id*. As with summary judgment, the court views the evidence in the light most favorable to the nonmoving party and draws reasonable inferences in its favor. *Id*. If the party opposing arbitration identifies a genuine issue of fact as to whether an

arbitration agreement was formed, "the court shall proceed summarily to the trial thereof." *Id*. (quoting 9 U.S.C. § 4).

**B. Rule 12(b)(6)**

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] all well-pleaded facts as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Lax*, 20 F.4th at 1181. However, the court need not accept as true "statements of law or unsupported conclusory factual allegations." *Id.* (quoting *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021)). "While detailed factual allegations are not necessary to survive a motion to dismiss, [the standard] does require 'more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action to be considered adequate.'" *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (quoting *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Deciding the plausibility of the claim is

"a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## III. Analysis

### A. Motion to Compel Arbitration

"A court should compel arbitration when (1) there was a valid agreement between the parties to arbitrate, (2) the claim at issue falls within the scope of that agreement, and (3) a party has nevertheless refused to arbitrate." *Harris v. W6LS, Inc.*, 2026 WL 1641195, at *2 (7th Cir. June 5, 2026) (citing *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 702 (7th Cir. 2022)).

Plaintiff does not dispute that each element is met but argues that the Agreement is unenforceable under the prospective waiver doctrine, under which a court may find an arbitration agreement is unenforceable if the agreement waives a party's right to pursue statutory remedies. *Smith v. Bd. of Directors of Triad Mfg., Inc.*, 13 F.4th 613, 619 (7th Cir. 2021). Defendants raise three separate but interrelated arguments in response. Defendants argue that (1) the prospective waiver doctrine applies only to *federal* statutory rights, and Plaintiff seeks only to vindicate *state* statutory rights; (2) the Agreement does not contain a prospective waiver of *any* rights, state or federal; and (3) in any event, the Agreement requires that an arbitrator decide whether the Agreement is enforceable. The Court addresses each.

#### i. The Prospective Waiver Doctrine Applies to State Rights

Before addressing the parties' arguments regarding the prospective waiver doctrine, it is helpful to review its origins. This doctrine (sometimes also called the "effective vindication exception") first appeared in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, where the Supreme Court "note[d] that in the event the [arbitration provision's] choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, [the Court] would have little hesitation in condemning the agreement as against public policy." 473 U.S. 614, 637 n.19 (1985) (collecting authorities).

In *Am. Exp. Co. v. Italian Colors Rest.*, the Supreme Court revisited the doctrine and described it as "a willingness to invalidate, on public policy grounds, arbitration agreements that operate as a prospective waiver of a party's right to pursue statutory remedies." 570 U.S. 228, 235-36 (2013) (cleaned up). This willingness "would certainly" extend to "a provision in an arbitration agreement forbidding the assertion of certain statutory rights." *Id*. In *Italian Colors*, the Court considered a provision in the arbitration agreement that might have made it cost-prohibitive for an individual claimant to prove their claims in arbitration. *Id*. at 236. The Court held the agreement enforceable because although the provision increased the cost of bringing a claim, it did not "eliminat[e] . . . the *right to pursue* that remedy." *Id*. at 236.

Against this backdrop, plenty of courts have considered arbitration agreements that *do* limit a claimant's right to pursue statutory remedies. For example, the Seventh Circuit was confronted with such an agreement in *Smith*. There, the plaintiff participated in an ERISA plan that contained an arbitration agreement. *Smith*, 13

F.4th at 616. The arbitration agreement contained a provision that precluded a plan participant from seeking relief that would have "the purpose or effect of providing additional benefits" to anyone other than the claimant. *Id*. at 621. The *Smith* plaintiff sought relief under a provision of ERISA that provides that when an ERISA fiduciary breaches their duties, that fiduciary is personally liable "to make good to [the ERISA] plan any losses" that resulted from the breach. 8 U.S.C. § 1109. The statute further contemplated that the fiduciary could be removed. *Id*. That is to say, 8 U.S.C. § 1109 allowed a plaintiff to seek relief that could extend to the entire plan, while the arbitration agreement precluded an award of relief to anyone other than the individual claimant. Confronted with this discrepancy, the Seventh Circuit held that the arbitration provision was unenforceable. *Smith*, 13 F.4th at 621 ("[T]he plain text of [the statute] and the terms of the arbitration provision cannot be reconciled: what the statute permits, the plan precludes.").

Neither party disputes the principles underlying the prospective waiver doctrine, but Defendants argue that the doctrine only applies to a waiver of federal rights, rather than state rights. Defendants' view is shared by Justice Kagan's dissent in *Italian Colors*, where she wrote:

> When a state rule allegedly conflicts with the FAA, we apply standard preemption principles, asking whether the state law frustrates the FAA's purposes and objectives. If the state rule does so . . .the Supremacy Clause requires its invalidation. We have no earthly interest (quite the contrary) in vindicating that law. Our effective-vindication rule comes into play only when the FAA is alleged to conflict with another *federal* law, like the Sherman Act here. In that all-federal context, one law does not automatically bow to the other, and the effective-vindication rule serves as a way to reconcile any tension between them.

570 U.S. at 252 (Kagan, J., dissenting) (emphasis in original).

In a more recent case, *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639 (2022), the Supreme Court revisited this question. In its briefing before the Supreme Court, Viking River—an employer trying to compel arbitration—argued:

> While Moriana repeatedly invokes *Mitsubishi* for the supposed rule that an arbitration agreement cannot waive an entire statutory cause of action, that rule applies only to waivers of federal statutory rights, not state-law ones. When it comes to state efforts to insulate a state law from bilateral arbitration, the FAA and the Supremacy Clause supply the rule of decision.

*Viking River Cruises, Inc., v. Angie Moriana,* Reply Br., 2022 WL 839398, at *7 (internal citations and quotations omitted). Although the Supreme Court decided *Viking River* on the issue of preemption, rather than prospective waiver, the Court addressed Viking River's prospective waiver argument in a footnote:

> In briefing before this Court, Viking argued that the principle that the FAA does not mandate enforcement of provisions waiving substantive rights is limited to federal statutes. This argument is erroneous. ***The basis of this principle is not anything unique about federal statutes***. . . .

596 U.S. at 653 n.5 (emphasis added). The Court further explained that "the FAA does not require courts to enforce contractual waivers of substantive rights and remedies . . . ." *Id*. at 653 (emphasis added) (cleaned up).

Since *Viking River*, many (but not all) courts that have been confronted with this issue have held that the prospective waiver applies to state statutory rights. *See, e.g., Harris v. W6LS, Inc.*, No. 23 CV 16429, 2024 WL 2319716, at *8 (N.D. Ill. May 22, 2024), *aff'd*, 177 F.4th 777 (7th Cir. 2026) (thoroughly reviewing this caselaw and

finding that the doctrine applies to waivers of substantive state law rights); *Fahy v. Minto Dev. Corp.*, 722 F. Supp. 3d 784, 803 (N.D. Ill. 2024) (*Viking River* "express[ly] reject[ed]" the defendant's argument); *Fitzgerald v. Wildcat*, 687 F. Supp. 3d 756, 777 (W.D. Va. 2023) (under *Viking River*, "an arbitration agreement prospectively waiving all state substantive rights and remedies can be found unenforceable for violating public policy."). The Seventh Circuit has not yet decided the issue, but it noted in dicta that *Viking River* "at the very least strongly suggests that an arbitration agreement" that "impermissibly forces borrowers to prospectively waive their state-law rights" may be unenforceable under the doctrine. *Harris v. W6LS, Inc.*, 177 F.4th 777, 788 (7th Cir. 2026).[3]

Defendants vigorously argue that this position cannot be reconciled with the Supreme Court's holding in *DIRECTV, Inc. v. Imburgia*. [45] at 9-10. There, the Court considered a very specific temporal issue. The parties entered into an arbitration agreement that both (1) waived the right to participate in a class-wide arbitration, and (2) purported to apply the laws of the contracting parties' state. 577 U.S. 47, 50-53 (2015). At the time the parties entered into the agreement, California law provided that an arbitration agreement could not waive a party's right to classwide relief. *Id.* But *after* the parties entered into the agreement, the Supreme Court held that the California law prohibiting classwide relief waivers was preempted by the FAA. *Id.*

[3] The issue came to the Seventh Circuit on appeal after the district court in *Harris* held that the prospective doctrine applied to state laws and denied a tribal-lending defendant's motion to compel arbitration. *Harris*, 2024 WL 2319716, at *8. The Seventh Circuit affirmed the district court's opinion on other grounds: namely, that the parties lacked mutual assent necessary to form a contract with one another. 177 F.4th at 787.

The question facing the Court was whether the arbitration agreement bound the parties to the law of their state, even if that law had been rendered invalid between the time the parties entered into the agreement and the time the parties sought to enforce the agreement. *See id.* at 55.

Defendants rely on *dicta* where the Court noted that parties "might choose to have portions of their contract governed by the law of Tibet, the law of pre-revolutionary Russia, or . . . the law of California." 577 U.S. 47, 54 (2015). As Defendants read it, if parties agree to have their contract governed by the law of Tibet, they can also contract away their state substantive rights. The problem with this argument is that if taken seriously, it would *also* mean that parties could contract away their *federal* statutory rights, and even Defendants agree that the prospective waiver doctrine would preclude such a waiver. Reading *Imburgia*'s dicta in connection with the Supreme Court's caselaw on prospective waiver leads to the more logical conclusion that parties *can* agree to have their contract governed by the law of Tibet *to the extent that* the choice of law does not function to waive a party's state or federal statutory rights. *See Viking River*, 596 U.S. at 653 ("[B]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute."). *Mitsubishi Motors Corp.*, 473 U.S. at 637 n.19 (expressing concern where an arbitration agreement's "choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies[.]").

The Court holds that the prospective waiver doctrine applies to state statutory rights.

### ii. The Agreement waives prospective state and federal rights.

#### 1. State Rights

Having found that the prospective waiver doctrine applies to state statutory rights, the Court considers whether (1) Plaintiff here seeks to vindicate any state substantive rights, and (2) the terms of Agreement waive any such rights.

Plaintiff's complaint alleges that the Loan violates the Illinois Predatory Loan Prevention Act ("PLPA") and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). The PLPA provides that a lender shall not charge a rate of more than 36% per year on any loan. 815 ILCS 123/15-5-5. The PLPA further contains a subsection titled "No waivers," which provides in its entirety that "[t]here shall be no waiver of any provision of [the PLPA]." *Id*. at 123/15-10-25.[4] Moreover, the PLPA provides that any violation of its terms "constitutes a violation of the [ICFA.]". *Id*. at 123/15-10-5(b). The ICFA, in turn, provides that any person who has suffered damages because of an ICFA violation may seek damages, attorneys' fees, and injunctive relief. 815 ILCS 505/10a(a), (c). There is no doubt that Plaintiff seeks to vindicate a state statutory right.

Moreover, the Agreement purports to preclude Plaintiff from vindicating that right. In its governing law provision, the Agreement provides:

> This agreement is made and accepted in the sovereign territory of the Lender in the Flandreau Santee Sioux Tribe and shall be governed by the applicable federal law and the tribal and substantive law of the

[4] The *Second Restatement* provides: "In the ... usury area[], choice-of-law provisions have not been permitted to override protective statutes of the state whose local law would have been applied in the absence of an effective choice of law by the parties." Restatement 2d, Conflict of Laws §187, Comment g.

> Flandreau Santee Sioux Tribe, including, but not limited to the Tribe's Lending and Consumer Protection Act, and the Federal Arbitration Act, without regard to conflicts of law principles . . . For the avoidance of doubt, it is not intended and shall not be interpreted to mean that the State of South Dakota or any other state has lawful authority to regulate the Business or any activities of the Lender or its officers, employees, or agents, or this Agreement . . . .

[35-2] ¶ 12 (the "Governing Law Provision"). The Agreement thus prohibits the application of state law, including PLPA and ICFA, in any disputes arising from the Loan. Accordingly, the Court finds that the Agreement contains an unenforceable prospective waiver of state statutory rights.

#### 1. Federal Rights

Defendants argue at length the Agreement does *not* function as a waiver of any federal law because the (1) the Governing Law Provision specifically provides that the Agreement "shall be governed by the applicable federal law," and (2) the Tribe's Lending and Consumer Protection Act expressly calls for applying "Federal Consumer Protection Laws." [45] at 6-7. The Court disagrees.

The Court begins with asking whether Plaintiff seeks to vindicate a federal statutory right. The complaint alleges that Defendants violated RICO by charging usurious interest rates on unlawful debt. [1] ¶¶ 99-116. RICO, a federal statute, prohibits collecting interest on "unlawful debt." 18 U.S.C. § 1962(a). Suffice it to say, Plaintiff is seeking to vindicate the rights afforded to her under RICO. The next question is whether the Agreement operates as a waiver of that right.

As Defendants point out, the Agreement specifically provides that it will apply "the applicable federal law." Assuming (as Defendants' argument requires) that RICO

is included in "the applicable federal law", the Agreement facially suggests a claimant may vindicate their rights under RICO in arbitration. But consider the actual text of RICO. That statute prohibits collecting interest on an unlawful debt. RICO defines an "unlawful debt" as one that "was incurred in connection with . . . lending money . . . at a rate usurious *under State or Federal law*, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6) (emphasis added). Critically, there is no federal law that defines any usurious rates, so the *only* way that a debt can be unlawful (as relevant here) is in reference to state law. And as noted above, the Agreement *precludes* the application of state law to the resolution of any dispute in arbitration. There is thus no way for a plaintiff to vindicate their federal statutory RICO rights under the terms of the Agreement.

Defendants respond that the Tribe has its own Lending and Consumer Protection Act, which contemplates the application of "Federal Consumer Protection Laws" (the "FSST Act"). [45] at 6. The FSST Act provides that "[u]nless a maximum interest rate or charge is specifically established elsewhere in the code, there is no maximum interest rate or charge, or usury rate restriction . . ." *Id*. at 78. It further provides that a lender may impose any interest rate so long as the rate does not violate the statute or any "Federal Consumer Protection Laws or any federal usury law." *Id*. The FSST ACT defines "Federal Consumer Protection Laws" to include a several federal statutes including the Dodd-Frank Act, the Fair Credit Billing Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Truth in Lending Act, and more. *Id*. at 76. Notably absent from the list, however, is the statute under

which Plaintiff seeks to vindicate her rights—RICO. Defendants urge that because the federal statutes named in the FSST Act is not exhaustive, the FSST Act could be read to include RICO. [45] at 6 n.2. Assuming that is true, Defendants are left with the problem just discussed—because RICO defines an unlawful debt in terms "State or Federal law," 18 U.S.C. § 1961(6), and because there is no relevant federal law setting a rate at which interest becomes unlawful, the *only way* for a plaintiff to vindicate their RICO rights is in reference to state law, which the Agreement precludes.[5]

Accordingly, the Court holds that the Agreement contains a prospective waiver of federal statutory rights and is thus unenforceable.

**iii. The Delegation provision is unenforceable.**

The final question is whether the Court can consider the issue of prospective waiver at all, or whether that issue is properly left to the arbitrator to determine.

Threshold questions of arbitrability, including disputes regarding the enforceability of an arbitration agreement, are "presumptively for courts to decide." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 n.2 (2013). A party can overcome this presumption by showing that the agreement terms "clearly and unmistakably" assign enforceability disputes to the arbitrator. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citation omitted). Unless a party

---

[5] The problem is well-illustrated in Defendants' motion to dismiss in the alternative, where Defendants argue that Plaintiff's RICO claim must be dismissed because the Agreement applies tribal law, and under the relevant tribal law the debt is not unlawful. [35] at 22-24. Put differently, Defendants argue that Plaintiff *prospectively waived* her ability to *raise a federal statutory claim* when she signed the Agreement.

"challenge[s] the delegation clause specifically," courts must enforce a delegation clause and leave to the arbitrator any disputes regarding the enforceability of the arbitration agreement. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010).

"The Seventh Circuit has not addressed the enforceability of delegation provisions in tribal lending contracts, but courts in other circuits have concluded that to challenge an agreement's delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions." *Fahy v. Minto Dev. Corp.*, 722 F. Supp. 3d 784, 797 (N.D. Ill. 2024) (collecting cases) (cleaned up).

Under the Agreement, the parties agreed to arbitrate all "disputes," and the Agreement defines disputes as follows:

> all claims, disputes, or controversies arising from or relating directly or indirectly to the signing of this Agreement, the validity, enforceability, applicable law, and/or scope of this Agreement, the agreement to arbitrate all disputes relating directly or indirectly to the signing, validity, enforceability, unconscionability, applicable law, and/or scope of the agreement to arbitrate all disputes pursuant to this Agreement, and any claim or attempt to set aside the Agreement

[35-2] at 7. This clause (the "Delegation Clause") delegates disputes regarding the enforceability and choice of law in the Agreement to the arbitrator.

Defendants argue that Plaintiff has not "specifically" challenged the delegation provision. The Court does not agree. In Plaintiff's opposition to the motion to compel, Plaintiff specifically includes a subsection challenging the delegation provision, as well as nearly five pages of argument as to why the provision is unenforceable. [42] at 11-15. Plaintiff challenges the delegation clause because it precludes consideration

of necessary state and federal law. While that argument is *similar* to Plaintiff's argument that the Agreement is unenforceable, she specifically challenges the Delegation Clause. *See, e.g.*, *Fahy*, 722 F.Supp.3d at 798 (plaintiff's argument that the governing law provision deprives the arbitrator from applying the body of law necessary to determine arbitrability "clearly addresses the validity of the delegation clause"); *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 243 (3d Cir. 2020) ("The prospective waiver of statutory rights renders the entire arbitration agreement (delegation clause included) unenforceable.").

As to the substance of the challenge, Plaintiff argues that the Delegation Clause "creates a paradox" because it "instructs the arbitrator to decide the validity of the arbitration agreement, but the Governing Law Clause strips the arbitrator of the tools needed to do so." [42] at 15. The Court agrees. Defendants would have an arbitrator hear Plaintiff's dispute regarding the choice of law provision while subjecting the arbitrator's consideration of that dispute to the very choice of law provision that Plaintiff seeks to challenge. Under similar circumstances, where an arbitration agreement evinces an attempt to circumvent federal or state statutory rights, courts have declined to enforce similar delegation clauses. *Hengle v. Treppa*, 19 F.4th 324, 337 (4th Cir. 2021); *Harris*, 686 F.Supp.3d at 741. For the same reasons, the Court finds that the Delegation Clause is not enforceable.

Accordingly, Defendants' motion to compel arbitration is denied.

### B. Motion to Dismiss

The Court next turns to Defendants' motion to dismiss the complaint. Moving Defendants argue that the complaint should be dismissed against them because (1) they are protected by sovereign immunity, (2) RICO does not authorize a private plaintiff to seek injunctive relief, and (3) the complaint fails to state a RICO claim against them.

**i. Sovereign Immunity**[6]

Defendants argue that Plaintiff's claims against the Tribal Defendants and Dernier are barred by tribal sovereign immunity. Plaintiff argues that Tribal Defendants are not immune from prospective injunctive relief for violations of state and federal law. With respect to Dernier, Plaintiff argues that sovereign immunity does not apply at all.

**1. Tribal Defendants immune from claims for money damages, but not from claims for prospective injunctive relief for violations of state and federal law.**

Indian tribes are "'domestic dependent nations'" that exercise "inherent sovereign authority." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (*Potawatomi*) (quoting *Cherokee Nation v. Georgia*, 5 Pet. 1, 17, 8 L.Ed. 25 (1831)). Yet tribes are also subject to plenary control by Congress. *See United States v. Lara*, 541 U.S. 193, 200 (2004) ("[T]he Constitution grants Congress" powers "we have consistently described as 'plenary and exclusive'" to "legislate in respect to

[6] The parties appear to agree that in the Seventh Circuit, challenges based on sovereign immunity at the pleadings stage are properly considered under Rule 12(b)(6) rather than Rule 12(b)(1). [35] at 11 n.3; [42] at 16. Accordingly, the Court treats Defendants' challenge as a motion to dismiss under Rule 12(b)(6).

Indian tribes"). Subject to congressional action to the contrary, then, tribes enjoy "common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978). The Supreme Court has thus "time and again treated the doctrine of tribal immunity [as] settled law and dismissed any suit against a tribe absent congressional authorization (or a waiver)." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 789 (2014) (citation and internal quotation omitted). As a corollary of this principle, sovereign immunity "bar[s] a State seeking to enforce its laws from filing suit against a tribe . . . [because] tribal immunity is a matter of federal law and is not subject to diminution by the States." *Id*. (citation and internal quotations omitted) (cleaned up).

But the Supreme Court has recognized that tribal immunity does not bar suits against "*individuals*, including tribal officers, responsible for unlawful conduct." *Bay Mills*, 572 U.S. at 796 (emphasis in original). Under the *Ex parte Young* doctrine, private individuals may "sue individual state officials for prospective relief to enjoin ongoing violations of federal law." *MCI Telecommunications Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 337 (7th Cir. 2000).

In *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) (*Pennhurst II*), the Court declined to extend the *Ex parte Young* doctrine to claims premised on violation of *state* law. *Pennhurst II*, 465 U.S. at 106. *Pennhurst II* called on the Court to consider whether sovereign immunity barred a claim for prospective injunctive relief against a Pennsylvania state institution for violations of Pennsylvania law. *See id*. at 107-08. The Court declined. It explained that the *Ex parte Young* doctrine was

necessary "to permit the federal courts to vindicate federal rights and hold state officials responsible 'to the supreme authority of the United States.'". *Id*. at 105 (citing *Ex parte Young*, 209 U.S. 123, 160 (1908)). Because *Pennhurst II* involved only the application of *Pennsylvania* law to *Pennsylvania* state officials, "the entire basis for the doctrine of *Young* . . . disappear[ed]." *Id*. at 106. With that understanding, courts have traditionally understood that "[t]he *Ex parte Young* doctrine may not be used to enjoin violations of state law." *MCI Telecommunications Corp*., 222 F.3d at 45 n.13 (citing *Pennhurst II*).

In 2014, the Supreme Court upended that understanding in *Bay Mills*. There, the state of Michigan sued the Bay Mills Indian Community, seeking injunctive relief in federal court after the tribe opened a casino on Michigan land in violation of a federal statute, the Indian Gaming Regulatory Act ("IGRA"). *Bay Mills*, 572 U.S. 782. The Supreme Court held that sovereign immunity barred Michigan's claim because, although Congress abrogated tribal immunity with respect to casinos operated *on* tribal lands, it had never done so with respect to casinos *off* tribal lands. *Id*. at 793-94. Michigan argued that without the relief they sought, Michigan would be powerless to regulate illegal tribal activity on Michigan's own land. In response, the Court explained:

> … a State lacks the ability to sue a tribe for illegal gaming when that activity occurs off the reservation. ***But a State, on its own lands, has many other powers over tribal gaming*** that it does not possess (absent consent) in Indian territory. Unless federal law provides differently, Indians going beyond reservation boundaries are subject to any generally applicable state law. So, for example, Michigan could, in the first instance, deny a license to Bay Mills for an off-reservation casino. And if Bay Mills went ahead anyway, ***Michigan could bring***

> ***suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction for, say, gambling without a license***. As this Court has stated before, analogizing to *Ex parte Young*, ***tribal immunity does not bar such a suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct***.

*Id*. at 795 (internal quotations and citations omitted) (emphasis added). *Bay Mills* thus appears to provide that under a theory analogical to *Young*, tribal officials may be enjoined for violations of state laws.

Courts are divided on how to understand *Bay Mills*. Defendants highlight a California district court's decision in *Del Rosa*, where the court explained:

> The Supreme Court [in *Bay Mills*] cited *Ex parte Young* in its explanation for why it rejected Michigan's arguments, but it did not hold that Michigan could proceed under *Ex parte Young*. . . . In short, the Supreme Court did not apply *Ex parte Young* in *Bay Mills*, and it did not actually consider whether any particular alternative claim would be permissible under the *Ex parte Young* doctrine or an analogous rule. Nor did the Court define or recognize any new analogous doctrine. It cited *Ex parte Young* only indirectly to explain why Michigan had overstated the negative effects of a ruling for the opposing tribe.

*California v. Del Rosa*, No. 2:23-CV-00743-KJM-SCR, 2024 WL 4819459, at *2 (E.D. Cal. Nov. 18, 2024) (cleaned up). Respectfully, the Court does not agree with this reading of *Bay Mills*. The Supreme Court is unequivocal that a state "has many powers over tribal gaming . . . . [F]or example . . . Michigan could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction . . .". *Bay Mills*, 572 U.S. at 795. Instead, this Court thinks the Supreme Court means what it said: under a theory analogized to *Ex parte Young*, tribal officials are not immune from claims seeking prospective injunctive relief for violations of state law that occur off tribal lands. All three circuit to have considered the issue since *Bay Mills* have

held the same. *Hengle v. Treppa*, 19 F.4th 324, 346 (4th Cir. 2021) ("Though the tribe itself retains sovereign immunity, it cannot shroud its officials with immunity in federal court when those officials violate applicable state law."); (*Gingras v. Think Fin., Inc.*, 922 F.3d 112, 121 (2d Cir. 2019) ("[T]he Supreme Court has already blessed *Ex parte Young*-by-analogy suits against tribal officials for violations of state law."); *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1290 (11th Cir. 2015) ("[T]ribal officials may be subject to suit in federal court for violations of state law under the fiction of *Ex parte Young* when their conduct occurs outside of Indian lands."). This Court joins that view today.

Here, Plaintiff seeks only prospective, non-monetary relief from Tribal Defendants. [42] at 20. Tribal Defendants do not contest that Plaintiff seeks relief for alleged violations that occurred off tribal land. *See generally* [45]. Accordingly, sovereign immunity does not protect Tribal Defendants from such claims.

**2. Dernier is not protected by sovereign immunity.**

Plaintiff seeks monetary damages in addition to injunctive relief against Defendant Dernier. [42] at 20-21. Defendants argue that Dernier is protected by sovereign immunity. That argument is premised on two contentions. The first is that FMS is an "arm of the tribe" and immune from suit just as the tribe itself is. The second is that because Dernier is CEO of FMS, immunity extends to him as well. [35] at 11-17. Plaintiff does not contest the first contention, but she does contest the second.

It is well-established that a plaintiff "cannot circumvent tribal immunity by merely naming officers or employees of the Tribe." *Chayoon v. Chao*, 355 F.3d 141, 143 (2d Cir. 2004). To determine whether agents or employees of a state may be sued, "courts should look to determine whether the sovereign is the real party in interest to determine whether sovereign immunity bars the suit." *Lewis v. Clarke*, 581 U.S. 155, 161-62 (2017).

In making this determination, "[t]he distinction between individual- and official-capacity suits is paramount." *Id*. at 162. "In an official-capacity claim, the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself." *Id*. The real party in interest in such suits, therefore, is the sovereign itself, rather than the named official. *Id*. But where a party seeks to impose "*individual* liability upon a government officer for actions taken under color of state law," on the other hand, "the real party in interest is the individual, not the sovereign." *Id*. at 162-63 (emphasis in original). The Seventh Circuit has explained, however, that even if a claim is nominally against an individual defendant in their individual capacity, immunity may still attach where the relief sought against the individual would "require action by the sovereign or disturb the sovereign's property." *Mestek v. LAC Courte Oreilles Cmty. Health Ctr.*, 72 F.4th 255, 261 (7th Cir. 2023).

Here, Plaintiff's allegations against Dernier seeks only money damages from Dernier as an individual, and if she is ultimately successful, her claims will disturb only Dernier's property rather than the Tribe's. Other courts have rejected individual, non-tribal defendants' claims for sovereign immunity where the defendant is

responsible for running a tribe's lending operations. *See Solomon v. Am. Web Loan*, 375 F. Supp. 3d 638, 661-62 (E.D. Va. 2019) (rejecting defendants' arguments that a suit against the architect of the scheme was one where the real party in interest was the tribe, given "the reality of Curry's role as the architect of the lending enterprise" and "the burden of relief would not be borne by the Tribe, as any relief granted to the Plaintiffs can be shaped so as to avoid taking from the Tribe."); *Pennachietti v. Mansfield*, No. CV 17-02582, 2017 WL 6311646, at *4 (E.D. Pa. Dec. 11, 2017) ("[A]ny judgment against [the non-tribal lending scheme operator] will implicate his personal assets and will not disturb the property or treasury of Sovereign . . . [so] he is not entitle to tribal sovereign immunity.").

Defendants argue that a judgment against Dernier in his individual capacity would implicate the Tribe's property because it would "impair the Tribe's ability to recruit and retain officers to operate or manage its lending business, as no individual would take on the massive liability that Plaintiff seeks to impose on Dernier." [45] at 20. Defendants' pure speculation as to effects regarding the potential outcome of this litigation is not enough to defeat Plaintiff's claims at the pleading stage. The complaint alleges that Dernier is the CEO and chief architect of the lending scheme, and that Dernier and other non-tribal actors receive "the vast majority" of the revenue derived from the scheme. [1] ¶ 31.

Dernier is not immune from suit in his individual capacity.

**ii. Binding Seventh Circuit precedent holds that injunctive relief is available in RICO actions**

Defendants next argue that injunctive relief is not available in a RICO claim. [35] at 19. Defendants correctly note that the Fourth and Ninth Circuits have both concluded that RICO does not authorize a private plaintiff to obtain injunctive relief. *See Hengle v. Treppa*, 19 F.4th 324, 353 356 (4th Cir. 2021); *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1088 (9th Cir. 1986). And three other circuits have called the availability of injunctive relief into question. *See Switzer v. Coan*, 261 F.3d 985, 992 n.14 (10th Cir. 2001); *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 848 (1st Cir. 1990); *In re Fredeman Litig.*, 843 F.2d 821, 830 (5th Cir. 1988).

But when the Seventh Circuit last considered the issue, it concluded that RICO *does* authorize injunctive relief for private plaintiffs. *Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 698 (7th Cir. 2001). *Scheidler* was reversed by the Supreme Court on other grounds, leaving some confusion about the availability of injunctive relief in this circuit. *See Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 411 (2003). Appellate court decisions that are reversed on one ground remain binding on the other grounds not addressed by the Supreme Court. *See, e.g., Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893–94 (5th Cir. 2001) (finding that the Fifth Circuit's precedent "binds us on the issue ... despite its reversal by the Supreme Court" "on other grounds"); *People of State of Ill. v. Lever Bros. Co.*, 530 F. Supp. 293, 295 (N.D. Ill. 1981) (finding that a Supreme Court decision that "did not address the Seventh Circuit's holding" on a particular issue and reversed on other grounds did not cause the remainder of the Seventh Circuit's decision "to evanesce as though

never written"). Accordingly, injunctive relief is available for a private plaintiff bringing a RICO action in the Seventh Circuit.

**iii. Plaintiff's complaint states RICO claims**

Defendants next argue that Plaintiff failed to state a claim under RICO. A RICO clam under 18 U.S.C. § 1962(c) requires four elements: (1) conduct; (2) enterprise; (3) pattern; and (4) racketeering activity or unlawful collection of debt. *See Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 727 (7th Cir. 1998) (quoting *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 778 (7th Cir. 1994)). Plaintiff also brings RICO conspiracy claims under 18 U.S.C. § 1962(d). A RICO conspiracy claim requires allegations that "each defendant knowingly facilitate[d] the activities of one who constitutes a manager or operator of the enterprise. *United States v. Cummings*, 395 F.3d 392, 397-98 (7th Cir. 2005).

Defendants argue that (1) Plaintiff fails to allege any unlawful debt, (2) Plaintiff fails to allege that Dernier or the Tribal Defendants directed the RICO enterprise's affairs, and (3) Plaintiff fails to allege that each defendant knowing facilitated a manager or operator of the enterprise's activities, as required for a RICO conspiracy claim.

Defendants' first argument—that Plaintiff fails to allege an unlawful debt—can be quickly dispatched with. As discussed *supra*, Defendant argues that the Agreement's Governing Law Provision requires that state law cannot be applied to the agreement, and Plaintiff can thus point to no "unlawful debt" under RICO. But for the reasons already discussed, the Court has held that the Governing Law

Provision is unenforceable because it acts as a prospective waiver of Plaintiff's state and federal statutory rights. Illinois sets a maximum interest rate of 36%" 815 ILCS 123/15-5-5, and Plaintiff alleges that Defendants charged her an interest rate of more than 700%. [1] ¶ 2. Plaintiff has thus alleged an unlawful debt.

Defendants next contend that Plaintiff failed to allege that they "ha[ve] some part in directing the alleged RICO enterprise's affairs." [35] at 24. *See Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (…one must have some part in directing those affairs…"); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998) ("mere participation in the activities of the enterprise is insufficient; the defendant must participate in the operation or management of the enterprise.").

Defendants acknowledge Plaintiff's allegations that Dernier runs[7] FMS and 605 Lending, but they argue that the enterprise as Plaintiff defines it is broader than either entity. Plaintiff defines the enterprise as consisting of "Defendants Dustin Dernier, Infinity Software, Steve Christensen, Anthony Reider, Cyndi Weddell, April Herrick, Ryan Kills A Hundred, Kristi Bietz, David Ross, Jonathan Schrader Sr., United Portfolio Management, Forest Hill Account Management Inc., and the unnamed officers, executives, as-of-yet unidentified funders, and [others]" [1] ¶ 101 (the "Alleged Enterprise"). *Even if* Dernier and the Tribal Defendants have some role in directing the FMS and 605 Lending, Defendants argue, they do not direct the Alleged Enterprise.

[7] Defendants note in their memorandum that Dernier is no longer employed by the Tribe. [35] at 4. Because the Court is required to take Plaintiff's allegations as true, and because Plaintiff alleged that Dernier was employed by the Tribe at the time of the complaint, the Court refers to Dernier's employment in the present tense.

The Court does not agree. The Complaint alleges that Tribal Defendants "authoriz[ed] Dernier [and other non-Tribal Defendants] to enter agreements with consumers throughout the United States that are illegal under state law on behalf of tribal entities and purportedly under tribal law" and "collect[ed] the resulting unlawful debt." [1] ¶ 173. Tribal Defendants make up the Executive Committee, which oversees the operations of FMS and 605 Lending, and those organizations are integral parts of the tribe's lending operation. [1] ¶¶ 45-70. Dernier is alleged to run FMS and 605 Lending and to sit on the FMS's board of directors. [1] ¶¶ 49, 52.

These allegations are sufficient to state a claim under § 1962(c). *See Fitzgerald v. Wildcat*, 687 F. Supp. 3d 756, 787 (W.D. Va. 2023) (allegations that "Tribal Council Defendants oversee and manage the [tribal and non-tribal entities] who have issued unlawful loans" were sufficient to state a RICO claim); *Hengle*, v. Asner, 433 F. Supp. 3d at 897 (allegations that defendants established legal entities necessary to the lending operation and "possessed significant authority and influence over the enterprise" sufficient to state a claim). With the benefit of discovery, Defendants may be able to establish that they had a smaller role in the enterprise than Plaintiff alleges. But at the pleadings stage, Plaintiff's complaint is sufficient.

Finally, Defendants argue that Plaintiff's RICO conspiracy claims under 18 U.S.C. § 1962(d) fail. "[T]he touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998). Accordingly, the Seventh Circuit has explained that to "plead a viable § 1962(d) claim,

a plaintiff must allege that a defendant agreed to the objective of a violation of RICO." *Id*. (internal quotation and citation omitted). More specifically, "the agreement must be to knowingly facilitate the activities of the operators or managers to whom [§ 1962(c)] applies.... It is an agreement, not to operate or manage the enterprise, but personally to facilitate the activities of those who do." *U.S. v. Cummings*, 395 F.3d 392, 397 (7th Cir. 2005) (citing *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000). The Seventh Circuit has noted that it is "painfully aware that this is not a bright line[.]". *Brower*, 199 F.3d at 967.

The question, then, is whether Plaintiff has adequately alleged that Defendants "personally [] facilitate[d]" the activities of the operators or managers to whom § 1962(c) applies. For the reasons just discussed, the Court holds that she has. The complaint lays out a scheme wherein Dernier and other non-tribal Defendants operate multiple distinct entities with the purpose of charging interest rates that, if charged without the ostensible protection of the Tribe's law, would be obviously illegal. The complaint alleges that Tribal Defendants agreed to work with Dernier and other non-tribal entities for the specific purpose of charging those otherwise unlawful interest rates, and that Tribal Defendants authorized all the conduct complained of. Again, with the benefit of discovery, Defendants may well establish that they lacked the personal knowledge necessary for liability under § 1962(d). But at the pleadings stage, Plaintiff has met her burden.

## IV. Conclusion

For the stated reasons, Defendants' motion to compel arbitration, or in the alternative to dismiss [34], is denied.

E N T E R:

Dated: September 1, 2026

MARY M. ROWLAND
United States District Judge